Filed 10/9/13  P. v. Martinez CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MATTHEW R. MARTINEZ,<br><br>    Defendant and Appellant. | B241311<br><br>(Los Angeles County<br>Super. Ct. No. MA054117) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Carol Koppel, Judge.  Affirmed.

Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey and Rene Judkiewicz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Matthew R. Martinez (Martinez) appeals his convictions for attempted murder (Pen. Code, §§ 664, 187)[1] and assault with a deadly weapon (§ 245, subd. (a)). He contends: (1) the trial court erred when it gave an incomplete and/or erroneous instruction regarding when a mutual combatant or initial aggressor can reclaim the right of self-defense; and (2) the People failed to prove malice in the attempted murder count because there was insufficient evidence that he did not act in imperfect self-defense or heat of passion. We find no error and affirm.

## FACTS

### The People's Case

At one time in his life, Eric Jones (Jones) was homeless. When he sees homeless people, he encourages them to improve their lives.

Jones first saw Martinez at a 99 Cent Store. While his wife and son went into the store, Jones got out of his car, approached a homeless man named Kenny and spoke to him. Then Jones spoke to Martinez, who was nearby, and tried to give him encouragement by commiserating about his situation. After Jones walked away, Martinez took off his shirt and went around the parking lot yelling, "Whoop, whoop, whoop, whoop." Martinez was angry at Jones and kicked his car. Eventually, Martinez calmed down and joined a group of people that included his girlfriend, Brittany Christine Martinez (Brittany). He had a pit bull. When Jones left, his wife drove. At no time did Jones try to drive his car into Martinez.

The second time Jones saw Martinez was at a gas station where Martinez and Kenny were begging for money. The pit bull was with Martinez, and it looked full grown. It scared Jones. Martinez kicked Jones's car three times. Jones did not threaten Martinez, try to run him over, rev his car engine, or stick his fingers at Martinez and pretend to have a gun.

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

On September 18, 2011, Jones was barbecuing at home with his family. At about 2:00 p.m. he had two beers. Sometime between 4:00 p.m. and 6:00 p.m., he went to buy beer at Stater Bros. Supermarket (Stater Bros.).

After Jones left Stater Bros. and got back into his car, he saw Martinez and Brittany walking the pit bull. There was an ensuing altercation, which was witnessed in part by two Stater Bros. employees, Daniel Curtis (Curtis) and Darren Blackwood. At the time, Jones was about 50 years old. Martinez was younger.

Curtis testified that he was 100 yards away. He saw Jones pull up to a stop sign near where Martinez was located. They argued. Martinez pounded on the driver's side window and shouted something that sounded like, "Get out of that car[,] I'll kick your ass." Jones yelled back. Then Martinez moved to the front of the car and pounded on the hood. Curtis did not see Martinez kick the car. Jones testified that Martinez gave him a mean look but said nothing. Then Martinez kicked the front fender.

Jones jumped out of his car to see if there was any damage. Because he was scared of the pit bull, he got a baseball bat from the trunk. While holding the bat in the middle, he walked to the front of the car to confront Martinez. Jones did not raise the bat. He intended to use the bat to protect himself in case the pit bull attacked. According to Curtis, the two men argued back and forth. When asked at trial, Jones said he could not remember if he said anything to Martinez. However, Jones specifically denied making threats. Curtis testified that Martinez "sicked" the dog on Jones and it charged him. To protect himself, Jones hit the dog with the bat. The dog yelped and ran away.

Martinez charged Jones. He swung the bat defensively while backing up. As Martinez tried to take the bat, he got hit a couple of times. Jones backed all the way around his car.

Curtis testified that Martinez and Brittany rushed Jones and took the bat away. But according to Jones, he simply dropped the bat. At that point, Martinez took possession of the bat and started swinging it, which caused Jones to dodge and back up against a wall. Martinez hit Jones with the bat at least three times as he tried to get away. To Curtis, the hits sounded like someone hitting a watermelon with a bat. He testified

3

that Martinez was "zealous" and "mad." One of the blows hit Jones above the right eye. Another blow hit him on the left side of the head. After the first time he was hit in the head, Jones said he could not have posed a threat to Martinez. Jones testified that "[h]e hit me so hard my eye could have popped out." In fact, the blow pushed blood through his retina and he ended up needing eye surgery as a result. One arm was broken in three places, and he later had pins put in his hand, wrist and forearm. His other arm was also injured. Blackwell testified that Jones did not do anything aggressive toward Martinez. According to Blackwell, the blows sounded like wooden thumps. Jones slumped over in a falling down motion and barely moved. He ended up with bruises "all over." Martinez stopped hitting Jones after hearing sirens approach. When Curtis shouted at Martinez, he dropped the bat, kicked Jones and fled the scene.

Jones went to the hospital for three or four weeks. For the first week, he was unconscious. Due to the fight, Jones had a broken nose and multiple cuts on his head that had to be closed with staples. He ended up with a scar on the back of his head, the side of his head and over his eye. Because of his broken hand, he could no longer close his fist. During surgery on his arm, he was given blood and plasma. His blood started to clot in his leg, so the doctors had to put a filter inside of him. Doctors also operated on Jones's eye. There was a 20 percent chance he could go blind. He has long term nerve damage and headaches every day. He cannot see well out of his damaged eye, and he has problems with memory.

**The Defense**

Brittany testified that while Martinez and she were behind Stater Bros., Jones approached them in his car. He said, "Remember me," and made a hand gesture as if shooting at them. When he opened his door to get out, Martinez used his foot to close the door. Jones exited his car, went to his trunk and then, swinging a bat, approached Martinez. Martinez took a few steps back and blocked the bat with his forearm. Jones swung the bat at least three or four times. At one point, he swung so hard that he spun and fell. Martinez was nicked. Because he had to lean back to avoid getting hit, he also

4

fell. They both scrambled to get back up. Jones told Martinez, "You're going to jail tonight. I want the cops to come."

According to Brittany, Jones appeared drunk. He was swinging wildly and misplacing his footsteps. He did not take a proper stance when he swung the bat, which is why he fell.

After he stood up, Jones swung at Martinez again. Brittany's pit bull—which was a year and four months old—gave Jones a warning bark. The dog was 45 to 50 pounds. Jones hit it in the head. It ran into the middle of the street. Brittany had to run after the dog, grab it by the leash and bring it back. Jones advanced on Brittany. When Jones started to swing the bat, she grabbed it mid-swing and Martinez punched him in the face. Soon after, Jones let go of the bat.

Brittany held the bat in a nonthreatening manner. Jones lunged at her. She thought he was trying to recover the bat. Martinez took the bat from Brittany. When Jones lunged at Martinez, he at first backed up. But when Jones kept charging, Martinez used the bat to hit him. Even though he had been hit, Jones rushed Martinez twice more and got hit twice more. After the third hit, Jones stopped. So did Martinez. Jones said something, then got into his car and drove away.

**The Sentence**

The jury found Martinez guilty of attempted murder and assault with a deadly weapon. As to the attempted murder count, the jury found true the allegation that Martinez personally used a deadly weapon within the meaning of section 12022, subdivision (b)(1). Regarding both counts, the jury found true the allegation that Martinez inflicted great bodily injury within the meaning of section 12022.7, subdivision (a). The trial court sentenced Martinez to 13 years in state prison. The sentence was calculated based on the upper term of nine years for attempted murder, three years for the great bodily injury enhancement, and one year for the use of a deadly weapon enhancement.

This timely appeal followed.

## DISCUSSION

### I. The Mutual Combat/Initial Aggressor Instruction was Proper.

Pursuant to CALCRIM No. 3471, the trial court instructed that a "person who engages in mutual combat or who starts a fight has a right to self-defense only if: One, he actually had in good faith tried [to] stop fighting, and two, he indicated by word or by conduct to his opponent in a way that a reasonable person would understand that he wanted to stop fighting and that he had stopped fighting, and three, he gave his opponent a chance to stop fighting. If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight. [¶] A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose."

The trial court omitted the paragraph in CALCRIM No. 3471 that provides: "[I]f the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend (himself/herself) with deadly force and was not required to try to stop fighting [or] communicate the desire to stop to the opponent[, or give the opponent a chance to stop fighting]."

Martinez assigns error to the trial court's failure to instruct on the omitted paragraph. He relies on the holding in *People v. Quach* (2004) 116 Cal.App.4th 294, 301 [if an opponent uses deadly force in response to nondeadly force by the defendant, the defendant has a right of self-defense].

Upon review, we find no error. A trial court must instruct on any affirmative defense that is supported by substantial evidence. (*People v. Salas* (2006) 37 Cal.4th 967, 982.) But the evidence did not support Martinez's contention that he was entitled to reclaim self-defense. While Brittany's testimony suggests that Martinez initiated the altercation with nondeadly force, and that Jones responded with deadly force, her testimony did not suggest that it was impossible for Martinez to withdraw from the fight. Rather, it suggested the opposite. According to Brittany, Jones appeared to be drunk and was misplacing his steps when he was swinging the bat. Martinez was not boxed in, and

6

there was no evidence that he was unable to withdraw from the fight by retreating. Certainly, assuming Brittany's version of events, Martinez could have easily withdrawn once Jones turned his attention toward Brittany's pit bull. Further, it must be acknowledged that Martinez quickly came into possession of the bat. He could have tossed the bat away and withdrawn then.

Continuing on, Martinez contends that the evidence did not support the mutual combat/initial aggressor instruction or, in the alternative, the trial court failed to properly define mutual combat. These contentions lack merit.

In the case against Martinez, there was substantial evidence from which the jury could have concluded that Martinez was the initial aggressor. The evidence included the following: Martinez had kicked Jones's car on prior occasions; Martinez pounded on Jones's car window and said something that sounded like, "Get out of that car[,] I'll kick your ass;" Martinez either kicked the car or pounded on the hood; when Jones approached, Martinez let the pit bull off its leash to attack Jones; and after Jones hit the dog, Martinez rushed Jones. Likewise, there was substantial evidence that Martinez and Jones impliedly agreed to engage in mutual combat. It showed that Martinez kicked the car door to keep Jones from getting out in response to threats from Jones, or Martinez pounded on the window and issued his own threat. At that point, the jury could have concluded that there was an invitation to fight by either Martinez or Jones. Jones got out, grabbed a bat and approached Martinez. Martinez did not back down. Clearly, both had a chance to reflect on what might happen if the confrontation escalated. From this evidence, the jury could have concluded that the ensuing fight began or continued by mutual consent or agreement.[2]

Though Martinez argues that the trial court failed to give the jury the legal definition of mutual combat set forth in *People v. Ross* (2007) Cal.App.4th 1033 (*Ross*),

_____

[2] Martinez cites *Ross* and *People v. Rogers* (1958) 164 Cal.App.2d 555, 557 when arguing that the trial court should not have instructed on mutual combat. We have reviewed those cases and find them distinguishable. In any event, even assuming there was no evidence of mutual combat, there was certainly evidence that Martinez was the initial aggressor, which made the instruction proper.

this argument is belied by the record. *Ross* explained that "case law confirms that as used in this state's law of self-defense, 'mutual combat' means not merely a reciprocal exchange of blows but one *pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities*." (*Ross*, *supra*, 155 Cal.App.4th at p. 1045.) CALCRIM No. 3471 was sufficient under *Ross* because it informed the jury that two people are engaged in mutual combat only if they expressly or impliedly agreed to fight.

**II. There was Sufficient Evidence to Negate the Possibility that Martinez Acted in Imperfect Self-Defense or Heat of Passion.**

Martinez argues that his attempted murder conviction should be reversed because there is insufficient evidence that he acted with malice. The question presented is whether the record contains substantial evidence from which a reasonable trier of fact could find Martinez guilty beyond a reasonable doubt. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125.)

We find no error.

To prove attempted murder, a prosecutor must show that the defendant acted with malice, i.e., the specific intent to kill. In addition, attempted murder requires the commission of a direct but ineffectual act toward accomplishing the intended killing. (*People v. Smith* (2005) 37 Cal.4th 733, 739; *People v. Gonzalez* (2012) 54 Cal.4th 643, 653–654; §§ 187, subd. (a), 192.)

"Malice is presumptively absent when the defendant acts upon a sudden quarrel or heat of passion . . . , or [attempts to kill] in the unreasonable, but good faith, belief that deadly force is necessary in self-defense. [Citation.]" (*People v. Manriquez* (2005) 37 Cal.4th 547, 583.) If a jury finds that a defendant held an "'honest but unreasonable belief that [it was necessary] to defend oneself from imminent peril to life or great bodily injury,'" he or she may be convicted of attempted voluntary manslaughter in imperfect self-defense. (*People v. Blakeley* (2000) 23 Cal.4th 82, 86; *People v. McCoy* (2001) 25 Cal.4th 1111, 1115; §§ 192, 664.)

Martinez's first argument is based on imperfect self-defense.

8

The doctrine of imperfect self-defense requires that the "[f]ear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury. "'[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. An *imminent peril is one that, from appearances, must be instantly dealt with*." . . . [¶] This definition of imminence reflects the great value our society places on human life.' [Citation.] Put simply, the trier of fact must find an *actual* fear of an *imminent* harm. Without this finding, imperfect self-defense is no defense." (*In re Christian S.* (1994) 7 Cal.4th 768, 783 (*Christian S.*).)

"The principles of self-defense are founded in the doctrine of necessity. This foundation gives rise to two closely related rules. . . . First, only that force which is necessary to repel an attack may be used in self-defense; force which exceeds the necessity is not justified. [Citation.] Second, deadly force or force likely to cause great bodily injury may be used only to repel an attack which is in itself deadly or likely to cause great bodily injury; thus '[a] misdemeanor assault must be suffered without the privilege of retaliating with deadly force.' [Citations.]" (*People v. Clark* (1982) 130 Cal.App.3d 371, 380.)

A defendant cannot invoke imperfect self-defense if he initiates a physical assault and creates a situation in which his adversary's attack or pursuit is legally justified. (*Christian S., supra,* 7 Cal.4th at p. 773, fn. 1.)

We easily conclude that there was sufficient evidence that Martinez did not act in imperfect self-defense. The evidence favorable to the prosecution showed that when Jones approached, Martinez used his pit bull as a weapon to attack Jones. After Jones hit the dog, Martinez rushed Jones, causing him to back up. If Jones swung the bat, it was only in lawful self-defense during a scuffle for the bat. Under *Christian S.*, Martinez cannot claim imperfect-self defense because he initiated a physical assault and Jones's response was lawful. Moreover, Jones did not use deadly force, so Martinez's use of deadly force could not be justified. Further, Martinez took possession of the bat, which rendered Jones defenseless. At that point, Jones could not have possibly posed an

9

imminent threat of death or great bodily injury.  Nonetheless, Martinez used the bat to hit Jones in the head and body with such force that it could be heard over a hundred yards away and sounded like a watermelon being hit or a wooden thump.  Jones slumped over and was barely moving.  According to the evidence, Martinez did not stop attacking until he heard sirens and Curtis shouted.  Before running away, Martinez kicked Jones, who had already been incapacitated.  In our view, the evidence painted a vivid picture of a defendant who wanted to kill his victim.  This conclusion is bolstered by the severity of Jones's injuries.  (*People v. Lashley* (1991) 1 Cal.App.4th 938, 951 [serious injury is evidence of intent to kill].)

Martinez's second argument is based on heat of passion.

"Heat of passion arises when 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.'  [Citations.]"  (*People v. Barton* (1995) 12 Cal.4th 186, 201.)  "[T]he factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation.  The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim.  [Citations.]"  (*People v. Lee* (1999) 20 Cal.4th 47, 59.)  The qualifying passion can be any violent, intense, high-wrought or enthusiastic emotion, but not revenge.  If enough time elapses after the provocation for passion to subside and reason to return before the attempted killing, the defendant cannot claim heat of passion. (*People v. Breverman* (1998) 19 Cal.4th 142, 163.)

The evidence favorable to the prosecution showed that Martinez had a history of kicking Jones's car.  Outside of Stater Bros., Martinez gave Jones a mean look.  Then Martinez pounded on the window, shouted something akin to, "Get out of that car[,] I'll kick your ass," and either pounded on the hood or kicked the front fender.  The jury could have concluded that Martinez provoked the fight, not Jones.  After Jones got the bat, he held it in the middle and did not raise it as he approached Martinez.  Jones did not make

10

any threats. The jury could have concluded that Jones confronted Martinez in a nonviolent manner, nonoffensive manner, and he would not have caused an ordinary person of average disposition to act rashly or without due deliberation and reflection. In support of this conclusion, the jury could have found that Martinez acted with deliberation and reflection because his first response was to take the calculated step of using the pit bull as a weapon. Then he obtained the bat, kept attacking Jones, who was defenseless, and inflicted severe injuries to his head, eye, hand, wrist, and forearm. Even when Jones was incapacitated, Martinez kicked him. All this evidence suggests that Martinez acted with cold calculation. Last, the jury could have concluded that Martinez had been slighted when Jones offered encouragement about being homeless and was seeking revenge for that slight. If he was seeking revenge, Martinez was barred from claiming heat of passion.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
ASHMANN-GERST

We concur:


_____, P. J.
BOREN


_____, J.[*]
FERNS

---

[*]   Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

11